Jihan Thomas Petitioner asks this court to reverse the agency two findings and conclude that 1. The attacks on the Coptic Christians of Egypt is systematic, pervasive, and widespread that it amounts to pattern and practice of persecution. 2. The second finding is that Petitioner is a credible witness. The documentary evidence before this court from 2011 until the close of the record in 2017 shows gross acts of repeated and coordinated violence against the Coptic Christian that is unprecedented. There was evidence of killing, physical attacks, bombing and torching of women, raping and forced conversions of Christian women, extortion, destructions of Christian property and businesses by Muslim extremists with no state action. In some incidents, Your Honors, the Egyptian government was the persecutor of the Coptic Christian. According to the Human Rights Watch at AR 228 and 229, the army armored personnel carriers drove deliberately into the crowd, crushing and killing Christian troops and opened fire on them. According to the Human Rights Report, Christians were killed from bullets, blows to the head, and 13 from injuries and fractures inflicted by the vehicles. Thousands of these Copts have been peacefully protesting under Administrative Records 228 and 229. The protest was just for their grievances that the Coptic Christians has failed or the authority has failed to punish the perpetrators for attacks on the churches. The Human Rights Watch told Egypt, do not cover up the military killing of the Copts protesters. In 2011, Your Honor, Washington Times reported that Egypt was placed in a blacklisted nation that routinely abuses religious liberty and it became a country of a particular concern of the increased dramatic in the violence and murders of the Coptic Christian. So, Ms. Thomas, let me just jump in for a second. You know, there are kind of two, as I see this case, there are kind of two parts of this case. There is, what is the status of Coptic Christians in Egypt? And that's a very big question. Then there is the case of your client and what he complained about and that the immigration officials thought he was not credible. So if we could take a moment, and I don't want to cut you too short on the status of Coptic Christians, but I really want to hear from you about the credibility findings. So here's my, I've got a series of questions for you. My colleagues, please find that, just on a good order of issues here, if we find that the IJ and the BIA was wrong, they erred in finding that your client was not credible. Let's say they should have, they should have believed your client. Let's say the discrepancies were not significant enough between the, or if there were any discrepancies at all. What happens to this case? Let's say we just answered that question first. Where do we go with this? Well, we go with this is the court has to find the second prong of this question, whether there's a panopractice of the persecution of the Coptic Christian, and because his identity as a Coptic Christian was not in dispute by the agency, then he is eligible for asylum based on that theory alone. Second, if this court does not find a pattern in practice, then this court can find that they are a disfavored group because this court found in Se'el v. Ashcroft based on one mob violence in 1998, which is the main riot against the Chinese, you know, and the attacks against them that they were a disfavored group. But in the record before this court, you don't have only one mob violence. You have zillions of mob violence from 2011 to 2017. So I asked this court to find whether they are a disfavored group. If this court is inclined or not inclined to find either a pattern practice or disfavored group, then I asked the court to remand it back to determine whether the cumulative harm that he suffered amounts to past persecution because he had his broken arms. It was placed in a cast for 21 days. He received death threats. And on top of that, his dog was killed. He was like his child. So the cumulative harm that he suffered amounts to past persecution, which the agency did not make a finding for that. So if we were to find that he should have been found credible, but we're not yet convinced. Yeah, I'm not saying you're right or wrong. We're not quite there on the other part of the case, then you're saying we should we should. And I'm not saying that. I'm just trying to think through the issues in this case. We then, according to you, we should remand the case back to to reapply the past persecution analysis, but assume he's credible rather than not credible. That's correct. And I believe that the address credibility issue must be reversed for three reasons. One petition was never confronted with any of these inconsistency and offered any opportunity to rebut. Two, any brief preconceived intent to come to the United States for post query under the academic versus INS exception. And three, any perceived inconsistency between him and his father is just a misconstruction of the record. So, Your Honor, the IG failed completely to confront Mr. Aper and Farag with any of these inconsistency. And this court precedent in Perez Arco v. Lynch has helped. Since the IG never confronted petitioner with these inconsistency and offered him an opportunity to explain, the address credibility finding must be reversed. Not only did he confront him, but the judge was also required to say he accept these explanation as reasonable or cognizant reason for rejecting it under this court precedent in Solo Alarta v. Holder. So none of these things happened. And on top of that, any preconceived intent to come to the United States just because he applied for a visa eight times does not undermine his credibility. In fact, his repeated efforts to obtain a visa is consistent of an individual trying to escape. This court allowed this exception in Boris Akinmet v. INS, Marcus V. Gonzalez, Torcas v. INS and held that presenting any false evidence for the purpose of escaping harm may actually be fully consistent with the claim for asylum. And this is exactly what he did here. He was trying to leave the country. Well, the government is saying, oh, one of his visa happened outside the scope of the harm, which is in 2007. But petitioner at AR-117 and AR-127 testified that he had other incident that has happened to him in Egypt, but he's only speaking about the one that stands out. So he may have other incident that has happened to him in Egypt. In addition, petitioner was very kinder. He did not lie. You can see that he applied for the visa eight times. He came into the border. He presented himself. He did not lie. He said, please provide me protection on his asylum application. He was very kinder and he responded, you know, to all questions. And he was very plausible. Also, they discounted this. Ms. Thomas, can I ask you a quick question? Yes, please, Judge. Now, my understanding is that his family won the so-called lottery and they're in the United States now? That's correct. They are lawful permanent residents of the United States and his sister as well. Yeah. And I thought, do you, is there anywhere in the record where the, well, not to be, the IJ made reference, it would have made reference to that as a reason why he was trying to come to the United States versus an behind-the-scenes overtale? Okay, Your Honor. He's been trying to come from 2006. So it wasn't just because his family timing that, you know, they got the lottery. He was trying from 2006 and he made eight attempts throughout the years to try to come to the United States. It wasn't just because his family just won the lottery. At the very end, when he surrendered himself, so the timing has not an issue at all. And with respect to any perceived inconsistency between him and his father, I believe this is a total misconstruction of the record, Your Honor, because the agency is saying, well, did they contact the neighbor following the attack or did they go to the doctor? Well, the father has specifically said they went to the doctor at AR-179 and AR-169. Petitioner also said immediately afterwards, we did go to the doctor at AR-147. His declaration also at AR-469 says, my father helped me up and took me to a doctor immediately. I believe what created a confusion was a question to him saying, what happened next? So I think it was his explaining that his father... Can you address the other alleged inconsistency, which is when he left for Cairo? I think what he testified today or dad testified five or six days. Okay, Your Honor. With respect to that, it was petitioner saying he left several days. Initially, the father, when he was very coherent in all his responses, he said, my son left the apartment several days after the attack. And I quote the record at AR-169. Couple of days, the neighbor called me and told me that you and your son left three days later. At AR-170, petitioner's father testified, he asked if you can bring the son to apologize. And he told him it was not permissible. So even after the attack, he said, can my son come and testify? They told him no. At AR-177, the father testified a couple of days later, we contacted the neighbor and I was told that your wife can stay, but your son must go. So at three different occasions, he testified that his son left three days later. I can see that at AR-181, he said it was the next day. But this court has also to recognize that he said that after no less than four times that he was having difficulty to testify, that he's a person with a heart condition, that he had to stop his testimony and take a pill, that he said on numerous occasions that he's so stressed. At AR-168, that he said he's difficult to remember the date. At AR-171, 172, the agency just disregarded his testimony just because he said he's 100% ready to testify and does not want to leave the stand. Nobody took into consideration that this father does not want to disrupt his son's hearing. He does not want to delay any disturbance in, you know, in adjudication of his case. So he did not want to leave the stand and wanted to continue to testify. But he was mumbling. Even DH counsel herself questioned the interpreter and said, I believe, your honor, I'm concerned about the interpreter adding additional verbiage that I did not add. So I'm not so sure what the father has said or did not say. But I believe what happened here is that the judge just picked on facts that, you know, solely picks on facts favoring an adverse credibility while ignoring facts that undermine the result. And this is not what this court has held in Shrestha V. Holden. It said it has to look at the totality of circumstances. Assuming the father was under so much stress at the very end and messed up and said, yeah, it was the next day after he said, I'm so tired, I cannot concentrate, I need a break. This court held in Shrestha taking the totality of circumstances, the court should recognize that the normal limits of human understanding and memory may make some inconsistency or lack of recall present in any witness's case. So assuming this happened because he's so much under stress and said the next day, that should not be taken against him because at three prior occasions, he testified consistency with his son. So I ask that this court reverse the adverse credibility and I go back to the pattern and practice. The record before this court compels a conclusion that the Coptic Christians of Egypt are a minority that has suffered from pervasive, systematic attack that is widespread across Egypt, from the northern Egypt, whether it's Alexander, the bombing of the church, to Minya where the woman was paraded, stripped, and all the attackers were left unpunished. The pattern and practice finding in this court is even stronger than the treatment of the Kurdish Muslim in Armenia that this court find in Magoyan versus INS. The pattern and practice finding of the attacks against the Coptic Christian is even stronger than the acts of the harassment or the attacks on the Serbs that happened in Bosnia in Nevegdi Ashraf. I can't count about the kidnapping, the raping, the forced conversion of Christian women at AR 254 where it said now there's a Hossein Mubarak regime. As the record indicates and I can't cite more, according to 2012 the Christian homes were set on fire and according it was portrayed as the unprecedented exodus of the Christian out of their own homes and this happened because the police have been weakened and the Islamists have been emboldened at AR 322. USA Today reported that the Christian feels a mix of frustration at the incompetence of their own authorities. 2013 the record shows, according to Human Rights Watch, that the security were largely absent and failed to intervene when they were informed of ongoing attacks against churches across Egypt. Not one, it was across Egypt, your honor. I'll give you a minute for rebuttal but if you want to wrap up with one or two sentences now I'll give you a minute rebuttal. Okay, your honor. I want to tell you that the record indicate no state action. It indicates police lack of intervention and it indicates a pervasive widespread systematic pursuit. All right, thank you very much. We'll give you one minute for rebuttal. Mr. McOtter, can you still hear us okay? I can, your honor. Thank you. All right, give Blanca the, or Ms. Garul, the clock is going a little goopy on our end. No, that's all right. That's all right. Let us know when you're ready. If we need to hand time, we can hand time. There it goes. Thank you, Ms. Garul. All right, Mr. McOtter, you have the floor. I thank you, your honors. I may have pleased the court. Trent McOtter from the Department of Justice on behalf of respondent. Substantial evidence does support the BIA's adverse credibility finding here. And turning to the issue that was discussed previously, for starters, there were legitimate doubts about petitioner's intentions and coming to the United States. That first visa that he sought even before any alleged act of persecution, the BIA relied on that to say that this suggests the petitioner was interested in coming to the United States, not actually fleeing persecution. Petitioner argues the court can't consider that under the so-called academy exception, but there are three reasons why that's wrong. The first is that the BIA did not find the petitioner had actually lied to consular officials. In fact, the BIA seemed to assume the petitioner told the truth in his consular interview and on his visa application, but the timing of it suggested that he was actually lying later in the asylum proceedings. Second of all, the academy exception applies. Let me just jump in. If I could, counsel, let me just jump in there. I'm having a little trouble with that one, I have to say. It seems to me that if someone lives in a place like Egypt, you're a Coptic Christian, probably not the greatest place to be right now if you're a Coptic Christian. You might want to come to the United States because it just seems like the land of opportunity. It's a better place to come. And then all of a sudden, this horrible thing happens. And now you're like, well, now I really want to get out of here because now this thing happened with people throwing hot coffee on me or tea and my dog's being killed. Why are those two inconsistent to the point where we could find him not credible, the desire to come to the United States? I agree the court could look at it that way, your honor, that the BIA and the IJ could have looked at it that he wanted to come to the United States. And then he also happens to suffer a persecution. I don't think the record compels that interpretation. The fact that he had applied before any act of persecution and then kept applying over and over and over again, including after his family won the visa, the diversity visa lottery. Your honor, there's two ways to look at it. It could be, as you said, kind of two independent things, or it could be that it's actually an intention to come to the United States all along. I don't think the record compels the conclusion that that there's no connection between them, your honor. You know, I I can understand counsel if he was living in Ibiza or something, some paradise, and he's constantly trying to get out of town, so to speak. You would say, yeah. But does the Department of Justice, because I don't think this is subject to a lot of this is really an issue about the maltreatment and the issues facing Coptic Christians in Egypt. I mean, that's pretty well documented. You're right, your honor. The BIA and the IJ did both acknowledge that there are attacks against Coptic Christians. There's discrimination across the country. But as this court said in Wakari, W-A-K-K-A-R-Y, discrimination and isolated incidents, even perhaps more than isolated incidents of violence, don't necessarily compel that conclusion that Coptic Christians are being subject to that kind of systemic persecution. That's why I was asking you. I'm familiar with that case, but this is more than isolated incidents. I mean, it appears that the radical Muslim element, not that I'm not talking about all but the radical Muslim element has become quite active and has sought out Coptic Christians as easy in-place targets for their anti-Christian views. Jews also, by the way, not just Christians. And that's pretty well documented. I mean, I don't see that there's a big argument there. So I think the case, to me at least, turns on the question of whether he was credible, not whether there's a major issue with Egypt. All right. We agree, your honor. We do think the case turns largely on his credibility determination. And as I said, even if the court perhaps doesn't fully buy the argument that the petitioner's first application for it to come to the United States necessarily indicated that he was trying to come to the United States separate from persecution, there are a couple other reasons why the Akinmate exception the petitioner relies on wouldn't apply here. And the second one, beyond the one I already mentioned, is that Akinmate does speak specifically to lies solely to escape persecution, essentially to get out of the country and a lie was necessary to do so. But here, as I said, the timing of it suggests that's not the case and the record doesn't compel the contrary conclusion. Also, Akinmate was a pre-Real ID Act case, as was Marcos, who later cited it. And the Real ID says the immigration judge can't consider statements written or oral from any time whatsoever. So Akinmate's kind of blanket exception that IJs couldn't consider lies made during the consular visa process wouldn't survive after the Real ID Act. And there were other bases, your honors, remember, for an adverse credibility finding. The BIA pointed out that there were differences between the petitioner and his father in terms of what happened after this key alleged act of persecution, in terms of whether the petitioner left immediately for Cairo or left a week later, whether they immediately went to a neighbor or instead immediately had to go to a medical doctor for treatment. And I realize there are possibly different ways to read the record, different ways to read the testimony, but I think that just confirms that substantial evidence supports the BIA and the IJ's conclusion of the reading that they saw, which is that there were inconsistencies. Did the BIA or IJ give the petitioner an opportunity to explain? Obviously, they need to hear both sides before making their credibility. I have a few responses on that, your honor. First, the petitioner didn't raise this argument about an opportunity to explain at the BIA itself. And of course, the failure to do that is considered jurisdictional under this court's precedent, Barron v. Ashcroft. And I think your honors could look at the record, pages 35 to 38, and see petitioner didn't raise this opportunity to explain argument. Even on the merits, I think that it's incorrect, your honor. The issue here wasn't that petitioner was inconsistent within his own testimony or within his own statements. It's that the petitioner's story didn't match a different witness's story. Every case I've seen involving this rule giving a petitioner an opportunity to explain inconsistencies is about inconsistencies within his own statements. And asking the petitioner to explain why his father's statements didn't match his own is kind of asking for speculation. And it would also, I think, defeat the rule on segregating witnesses, which did happen in this case where the father was sent out of the courtroom while the petitioner testified. But to jump in real quick, counsel, on that, AR 147, I think the line in question is line 12, where Mr. Farrig says, so immediate, we did go to a doctor that we know is this private clinic. And what's unclear is whether he's referring to immediately after the attack or immediately after the conversation with the neighbor. And he was never given an opportunity to clarify that, which one it was. Was it after the attack or after the conversation with the neighbor? Wouldn't the doctrine apply to that sentence? It wouldn't, I think, Your Honor, because the I.J. did not rely on that apparent inconsistency or lack of clarity in finding that the petitioner lacked credibility. This isn't a case where the I.J. said that the petitioner's giving me different stories. He's giving me an unclear story about whether he went to the neighbor first or to a doctor first. Instead, the I.J. said, I see his testimony as saying he went to a doctor first, but that's not what the father is saying. And that was the inconsistency there. But as I said, no, I appreciate that. But how do we know that's what he meant when it says so immediate afterwards, we did go to a doctor immediate afterwards. We don't know what that's modified or pertaining to. We don't know if that's immediately after the attack or immediately after the conversation with the neighbor. I think from the context, Your Honor, I mean, for what it's worth, I read it the same way as the immigration judge is saying that immediately after the attack, they went to a doctor to get the treatment, which makes sense. He claims he had a broken arm. It makes sense that they would try to get that treated immediately. And as I said, the I.J. didn't rely on the petitioner being inconsistent within his own testimony. If the BIA and I.J. relied on that, then the doctrine would apply, Your Honor. But that's not the basis here. And at the very least, the rule about giving an opportunity to explain inconsistencies, as I said, I couldn't find a case where that was applied across multiple witnesses. I think would kind of defeat the purpose of it. But at the very least, I think there might be some doubts about whether even that rule would survive the Real ID Act. And so at the very least, the court shouldn't expand that doctrine to cover multiple witnesses giving different stories. Counselor, you would agree that when we're making the assessment at this level at the Ninth Circuit, we can only rely on what the BIA said, correct? There's those three grounds for lack of credibility. Those were the only ones the BIA relied on. I think in this context, it appears that the BIA made its own determinations. There's a footnote, Your Honor, saying that they're not going to address the other bases that the I.J. determined for credibility purposes anyway. So I agree on the credibility issue. Yes, Your Honor. And so with credibility, that defeats almost all petitioners' claims, all the asylum claims. The disfavored group claim would fail for the same reason as the BIA held. And then on the systemic persecution exception, I think we've covered that already. There are certainly examples. The record has multiple examples of Coptic Christians being attacked and facing discrimination. But it's a very, very high exception, a very, excuse me, a very, very high bar to reach that exception for systemic persecution. Only a few groups have ever been found to satisfy it. And perhaps the immigration judge or the BIA could have concluded that Coptic Christians satisfy that, but the record doesn't compel that, Your Honor, which, of course, is the standard of review here. And so because of that, petitioners' asylum claims all fail. All that's left is this CAT claim, which we addressed in our briefs. It wasn't adequately presented, I'd say, to this court. It fails for multiple other reasons that I won't say unless the court has any questions on it. Well, counsel, he doesn't rely. He's not saying the reason I came here is because I'm a Coptic Christian, and Coptic Christians are being abused and are being subjected to all kinds of violence, and therefore I'm leaving. That's why I left. What he said is that they went after him specifically. There was the situation where they saw his cross on a tattoo, I think it was, when he was in the car with some other young man that he was subjected to some violence there. And then, of course, there was the hot tea on his stomach. That might have been the same incident. I'm not sure. There was another incident. And then, of course, there was the incidents involving the unfortunate placement of the family home right across the street from a mosque, which apparently, according to him, was somewhat radicalized. And the people came across the street, and all kinds of stuff happened, and he was injured, and the dog was killed, as Judge Owens pointed out. So he's not just relying here on the generalized concern about Coptic Christians. He's talking about his own what he believes is a credible fear of violence due to his religious beliefs. I think he does perhaps present them as alternatives, Your Honor. I think he relies heavily, obviously, on his own experiences, and that was the focus of the testimony before the IJ. And then I saw him as raising an argument saying, well, the IJ or the BIA or this court doesn't buy that argument. Coptic Christians are so systemically persecuted that he doesn't need to Your Honor. So I think perhaps they're an alternative. I'm not sure. All right. Thank you. Last question for you, Mr. IJ. It's always good to sit down when no one's saying anything, but one quick question for you. So let's say I agree with you on the cat claim. Let's say I agree with you on the disfavored group. But let's say I have concerns about how that adverse credibility is perceived. What should we do procedurally? I guess it would depend, Your Honor, on the extent of the credibility concerns that you have. If there's still one remaining, I know this court has said that even a single adverse credibility basis can be enough. If the court concludes that none of the ones the BIA relied on are sufficient, I think we can say in our brief at that point the court should send it back to the BIA to address the remaining parts of petitioner's claims. It's also possible the BIA could say that the remaining credibility issues would be enough, the ones they declined, to address the first time. There are questions about nexus. There are questions about whether certain actions would amount to persecution. The court, as you say, could decide or could not decide to address the cat claims or to address the systemic persecution claims. It's obviously up to the court's discretion in that case. Unless there are any further questions, we respectfully ask that the court deny the petition. Thank you. All right. Thank you very much, Mr. McOtter. Ms. Thomas, you have one minute, so use it wisely. Your Honor, petitioner has been a credible witness. The agency disregarded ample of consistent statement that I wrote about it from page 22 to 23 that shows even with the sequester, wasn't it both recounted the same incidents about everything that had happened to them? They've disregarded all these consistent statements to rely on something that I'd say is just a misconstruction of the record or witness's testimony. And the judge in that case, share a pick on these evidence to just come up with the address credibility finding. Contrary to the agency and to my colleague, the evidence is not a discrimination of the Coptic Christian, but a systematic persecution. He said it's not that strong, but what else can the court have besides torturing, bombing, killing, attacking, expulsion, kidnapping, and raping of Christian people? That is systematic, wide, and pervasive. And I ask to grant the petition. Thank you, Your Honors. Well done in a minute for a very good job. Thank you both, counsel, for your argument in this case. Very well done. We really appreciate it. Thank you. Thank you, judges. Stay safe, everybody. Bye-bye. Thank you.
judges: Owens, Ezra, Lee